## Case No. 14,276.

TUTTLE v. ALBANY & R. IRON & STEEL CO.

[10 Ben. 449.] [1]

District Court, S. D. New York.   May, 1879.

DEMURRAGE—BILL OF LADING—DISCHARGE OF CARGO.

The bill of lading of a cargo of coal shipped on a canal-boat contained the following clause: "In case the consignee discharges cargo or any part thereof, he is to charge the master not to exceed twelve and a half cents per ton for the same and to have four full working days after due notice of the arrival of the boat at the dock of the consignee." It also provided for $10 a day demurrage thereafter. The boat arrived at the dock of the consignee and was reported. Other boats were waiting to be discharged by the consignee. The master was told that he might discharge his cargo, for which he was assigned dock-room, but he was also told that, if he wished the consignee to discharge his boat, he must wait his turn. He waited and was discharged in seven days from his reporting. He was then paid his freight and gave a receipt in full of all demands. Thereafter he filed a libel against the consignee to recover three days' demurrage. Held, that the discharge by the consignee was, on the evidence, an accommodation to the master and not an exercise of the right to discharge under the bill of lading, and that the consignee was not liable.

[This was a libel in personam by Ebenezer B. Tuttle to compel the payment of demurrage by the Albany & Rensselaer Iron & Steel Company, as consignee, for the detention of a canal boat.]

W. R. Beebe, for libellant.
Holbrook & Smith, for respondent.

CHOATE, District Judge. This is a suit to recover demurrage for detaining the libellant's canal-boat beyond the time allowed by the bill of lading for discharging her cargo of coal. The bill of lading, which was dated September 8th, 1875, acknowledged the shipment of the cargo at Watkins, N. Y., "to be delivered as addressed without delay, in like good order as received, subject to the following conditions:  *  *  *  In case the consignee discharges cargo, or any part thereof, he is to charge the master not to exceed twelve and a half cents per ton for the same, and to have four full working days after due notice of the arrival of the boat at the dock of the consignee, in which to discharge cargo, and to pay the master for any time (exclusive of Sundays and all legal holidays) the boat is detained by said consignee for discharging after the expiration of said three days, at the rate of ten dollars per day. The master to furnish men to attend guy on boat while unloading." The consignee named was the defendant, the Albany and Rensselaer Iron and Steel Company, Troy. The boat arrived at defendant's dock in Troy and the master reported his arrival to the defendant on the 15th of September at seven o'clock in the evening. The discharge of the cargo was

[1] [Reported by Robert D Benedict. Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

commenced on the 23rd of September and finished on the 24th at 4 p. m. The cargo was discharged by respondent's servants and by the use of their derricks. There is some conflict of evidence as to what took place between the master and the defendant's agents on his arrival and reporting in respect to the discharge of his cargo. His testimony is that he was only told that he must wait his turn to discharge; that after the discharge, when he received his freight money, he demanded his demurrage, which was refused, but that he was told that his taking his freight would make no difference about the demurrage. He signed a receipt in full of all demands. It is shown, I think, by the testimony of the employees of the company, in connection with the receipt, that on his arrival he was assigned dock-room, where he was told that he might discharge his cargo, and that he was also told that if he wished the company to discharge him he must wait his turn, and in that case that they would pay no demurrage, and that he declined to discharge himself and voluntarily waited his turn. And it is not proved that when he received his freight he claimed demurrage. It was shown that there were a large number of boats waiting to be discharged by the company; that the company had derricks arranged for discharging boats which they discharged; that there was plenty of dock-room for libellant to discharge, but no derrick that was not in use by the company. The cause of the accumulation of boats at that time was that there had been a break in the canal. He now claims three days' demurrage, amounting to thirty dollars. The question turns on the proper construction of the bill of lading and the effect on the rights of the libellant of what took place between him and the company in reference to the discharge of the cargo.

The fair construction of the bill of lading is that, if the company should elect to discharge the cargo, instead of leaving the master to discharge it himself, the demurrage should be paid. The bill of lading imposed on the master the obligation to discharge. It modified that obligation only so far as it gave the company the privilege of discharging, if they saw fit to do so. What took place was not an election on their part to discharge the cargo, except for the master and as an accommodation to him. The acts of the master in taking his freight money and receipting for all demands in full, seem to show that he so understood the agreement. The boat was not detained by the consignee, therefore, within the meaning of the contract, but by the master himself. At any rate, it was competent for the parties to vary the contract as to demurrage, and it is evident from the testimony that the captain was contented to do so in the circumstances in which he found himself placed. From the evidence it is not unlikely that he concluded that the loss of two or three days was of less consequence to him than the greater trouble and expense involved in discharging his cargo without being able to use the facilities which the company had for doing the work.

Libel dismissed with costs.